**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| HAROLD PEREZ, Individually and For All Others Similarly Situated<br><br>v.<br><br>ON THE MARK UTILITY LOCATING SERVICES, INC. | Case No. _____<br><br>Jury Trial Demanded<br><br>Rule 23 Class Action<br>FLSA Collective Action |

## ORIGINAL CLASS & COLLECTIVE ACTION COMPLAINT

### SUMMARY

1.      Harold Perez brings this class and collective action to recover unpaid wages and other damages from On The Mark Utility Locating Services, Inc. ("OTM").

2.      OTM employed Perez as one of its Hourly Utility Locators (defined below) in New York.

3.      Perez and the other Hourly Utility Locators regularly work more than 40 hours a week.

4.      But OTM does not pay Perez and its other Utility Locators for all their hours worked.

5.      Instead, OTM requires Perez and its other Hourly Utility Locators to work significant time "off the clock" without pay.

6.      Specifically, OTM prohibits Perez and its other Hourly Utility Locators from "clocking in" for their shifts until they arrive at their first assigned ticket and requires them to "clock out" when they leave their last assigned ticket (OTM's "ticket to ticket policy").

7.      But to meet OTM's strict productivity requirements, Perez and the other Hourly Utility Locators are forced to perform their regular utility locating duties "off the clock" before their first ticket and after their last ticket.

8.      OTM, however, does not pay Perez and its other Hourly Utility Locators for the time they spend working "off the clock" before their first ticket and after their last ticket.

9.      OTM's uniform "ticket to ticket" policy violates the Fair Labor Standards Act ("FLSA") and the New York Labor Law ("NYLL") and its implementing regulations ("NYCRR") by depriving Perez and the other Hourly Utility Locators of overtime wages for all overtime hours worked.

10.     Similarly, OTM also requires Perez and its other Hourly Utility Locators to "clock out" for an hour a day to record they took a meal break, regardless of whether they actually received a *bona fide*, uninterrupted meal break (OTM's "meal break policy").

11.     Thus, OTM does not pay Perez and its other Hourly Utility Locators for that time.

12.     But Perez and the other Hourly Utility Locators do not actually receive *bona fide* meal breaks.

13.     Instead, to meet OTM's strict productivity requirements, Perez and the other Hourly Utility Locators are forced to perform their regular utility locating duties "off the clock" during their unpaid "meal breaks" for OTM's predominant benefit.

14.     OTM's uniform meal break policy violates the FLSA and the NYLL (and its implementing regulations) by depriving Perez and the other Hourly Utility Locators of overtime wages for all overtime hours worked.

## JURISDICTION & VENUE

15.     This Court has original subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because this case involves a federal question under the FLSA, 29 U.S.C. § 216(b).

16.     This Court also has supplemental jurisdiction over the state-law subclass claims because these claims arise from a common nucleus of operative facts. 28 U.S.C. § 1367.

17.     This Court has general personal jurisdiction over OTM because OTM is a domestic corporation.

18.     Venue is proper because a substantial portion of the events or omissions giving rise to this action occurred in this District. 28 U.S.C. § 1391(b)(2).

19.     Specifically, Perez primarily worked for OTM in Rockland County, which is in this District.

PARTIES

20.     OTM employed Perez as a utility locator in and around Rockland County, New York from approximately October 2019 through October 2021.

21.     Throughout his employment, OTM classified Perez as non-exempt and paid him on an hourly basis.

22.     Throughout his employment, OTM subjected Perez to its uniform, illegal "ticket to ticket" and meal break policies.

23.     But throughout his employment, OTM forced Perez to perform his regular utility locating duties "off the clock" (without pay) before he his first ticket, after his last ticket, and during his "meal breaks."

24.     Thus, OTM failed to pay Perez overtime for all his hours worked after 40 in a workweek, including those worked "off the clock," in willful violation of the FLSA and NYLL.

25.     Perez brings this class and collective action on behalf of himself and other similarly situated OTM utility locators[1] who were subject to OTM's illegal (1) "ticket to ticket" policy and/or (2) meal break policy.

---

[1] In the utility locating industry, utility locators are also referred to as "line locators," "field technicians," and "damage prevention inspectors."

26.     OTM prohibits each of its utility locators from "clocking in" until they arrive at their first assigned ticket and requires them to "clock out" when they leave their last assigned ticket.

27.     OTM also requires each of its utility locators to "clock out" for an hour a day for so-called "meal breaks."

28.     But OTM also requires each of its utility locators to perform their regular utility locating duties "off the clock" (without pay) before their first ticket, after their last ticket, and during their "meal breaks."

29.     Thus, OTM uniformly fails to pay its utility locators overtime for all hours worked after 40 in a workweek, including those worked "off the clock," in willful violation of the FLSA and NYLL.

30.     The FLSA Collective of similarly situated employees is defined as:

> **All hourly OTM utility locators who were subject to OTM's (1) "ticket to ticket" policy and/or (2) meal break policy at any time during the past 3 years (the "FLSA Collective Members").**

31.     Perez also seeks to represent a class under the NYLL pursuant to FED. R. CIV. P. 23.

32.     The New York Class of similarly situated employees is defined as:

> **All hourly OTM utility locators in New York who were subject to OTM's (1) "ticket to ticket" policy and/or (2) meal break policy at any time during the past 6 years and 228 days[2] (the "New York Class Members").**

33.     The FLSA Collective Members and the New York Class Members are collectively referred to as the "Hourly Utility Locators."

---

[2] This class period is due to Governor Cuomo's Executive Orders that tolled the applicable NYLL statute of limitations during the COVID-19 pandemic for a total of 228 days. *See Brash v. Richards*, 195 A.D. 3d 582, 2021 WL 2213786, 2021 N.Y. Slip Op 03436 (App. Div. 2d Dep't June 2, 2021) (holding executive order tolled rather than suspended statutes of limitations under New York law); *McLaughlin v. Snowlift Inc.*, 71 Misc. 3d 1226(A) (Sup. Ct., Kings Cnty. 2021) (calculating that, together, Governor Cuomo's Executive Orders lasted 228 days).

34.     OTM is a New York corporation headquartered in Rochester, New York.

35.     OTM may be served through its registered agent: **John Bryant, 400 Air Park Drive, Suite 30, Rochester, New York 14624**.

**FLSA COVERAGE**

36.     At all relevant times, OTM was an "employer" within the meaning of Section 3(d) of the FLSA, 29 U.S.C. § 203(d).

37.     At all relevant times, OTM was an "enterprise" within the meaning of Section 3(r) of the FLSA, 29 U.S.C. § 203(r).

38.     At all relevant times, OTM was an "enterprise engaged in commerce or in the production of goods for commerce" within the meaning of Section 3(s)(1) of the FLSA, 29 U.S.C. § 203(s)(1), because OTM has had employees engaged in commerce or in the production of goods for commerce, or employees handling, selling, or otherwise working on good or materials—such as cellphones, computers, vehicles, tools, and personal protective equipment—that have been moved in or produced for commerce.

39.     At all relevant times, OTM has had an annual gross volume of sales made or business done of not less than $1,000,000 each year.

40.     At all relevant times, Perez and the other Hourly Utility Locators were OTM's covered "employees" within the meaning of Section 3(e) of the FLSA, 29 U.S.C. § 203(e).

41.     At all relevant times, Perez and the other Hourly Utility Locators were engaged in commerce or in the production of goods for commerce.

42.     Under its uniform "ticket to ticket" policy, OTM prohibits Perez and its other Hourly Utility Locators from "clocking in" for their shifts until they arrive at their first assigned ticket and requires them to "clock out" for their shifts when they leave their last assigned ticket.

43.     Likewise, under its uniform meal break policy, OTM requires Perez and its other Hourly Utility Locators to "clock out" for an hour a day for so-called "meal breaks," regardless of whether they actually receive a *bona fide* meal break.

44.     But OTM also requires Perez and its other Hourly Utility Locators to perform their regular utility locating duties "off the clock" before their first ticket, after their last ticket, and during their "meal breaks."

45.     As a result, OTM fails to pay Perez and its other Hourly Utility Locators wages (including overtime) for the compensable work they perform "off the clock" before their first ticket, after their last ticket, and during their "meal breaks."

46.     OTM's "ticket to ticket" and meal break policies therefore violate the FLSA by depriving Perez and the other Hourly Utility Locators of overtime wages for all hours worked after 40 in a week. 29 U.S.C. § 207(a) & (e).

## FACTS

47.     OTM bills itself as a "utility management services business" that "locates, maps, verifies, tests, reads, assesses, monitors, surveys, manages, and prevents [utilities] from being damages by others."[3]

48.     "OTM provides utility management services to cities, towns, state municipalities, utility companies, construction companies, and other in New York State."[4]

49.     To meet its business objectives, OTM employs utility locators, including Perez and the other Hourly Utility Locators, to provide these utility management services to its clients.

50.     As utility locators, Perez's and the other Hourly Utility Locators' primary responsibilities include using ground-penetrating radar equipment to detect and locate network lines

---

[3] https://www.otmlocating.com/about-us (cleaned up) (last visited April 8, 2024).
[4] *Id.*

for gas, electrical, cable, and communications companies and government municipalities (OTM's clients); marking those underground utilities; visually inspecting network lines in predefined construction areas; identifying whether underground utilities conflict with proposed excavation locations; documenting (e.g., photographing, videoing, and/or sketching) completed location tickets; and communicating with contractors, excavation crews, utility reps, and OTM's clients to complete their assigned tickets.

51. OTM communicates daily assignments (also called "tickets") to Perez and its other Hourly Utility Locators through its uniform ticketing system.

52. OTM typically assigns Perez and its other Hourly Utility Locators to complete 15 to 20 tickets each day.

53. OTM requires Perez and its other Hourly Utility Locators to complete all of their assigned tickets each day.

54. OTM pressures Perez and its other Hourly Utility Locators to complete their assigned tickets as quickly as possible.

55. OTM expects Perez and its other Hourly Utility Locators to complete at least 2 tickets per hour, on average.

56. OTM closely monitors and tracks Perez's and its other Hourly Utility Locators' productivity through its company-wide ticketing system to ensure they meet OTM's strict expectations.

57. But to complete their heavy workloads in satisfaction of OTM's productivity requirements, Perez and the other Hourly Utility Locators are forced to work significant time "off the clock" (without pay).

58. While exact job duties and precise locations worked may differ, Perez and the other Hourly Utility Locators are all subject to OTM's same or similar illegal policies for similar work.

59.     For example, Perez worked for OTM as a utility locator in and around Rockland County, New York from approximately October 2019 through October 2021.

60.     Perez was OTM's hourly employee.

61.     Throughout his employment, OTM required Perez to report his work time to OTM for approval through its uniform timekeeping and ticketing system.

62.     Throughout his employment, Perez regularly worked more than 40 hours a week.

63.     Indeed, throughout his employment, Perez worked 10 to 12 hours a day for 5 to 6 days a week (or 50 to 72 hours a week) "on the clock."

64.     But throughout his employment, OTM also required Perez to work significant time "off the clock" (without pay) each week.

65.     For example, OTM subjected Perez to its illegal "ticket to ticket" policy.

66.     Specifically, OTM prohibited Perez from "clocking in" for his shifts until he arrived at his first assigned ticket and required him to "clock out" when he left his last assigned ticket.

67.     But OTM also required Perez to perform compensable work "off the clock" (without pay) before arriving to his first assigned ticket and after leaving his last assigned ticket.

68.     Specifically, before "clocking in" for his shifts, Perez loaded his necessary utility locating equipment (e.g., radar detection equipment, spray paint cans, stake flags, company laptop, etc.) into his company truck, reviewed his assigned tickets for the day, and route planned.

69.     Perez then drove his company truck either to a morning crew meeting at a designated location or to his first assigned ticket.

70.     During this commute, Perez made and fielded constant calls from OTM's clients, contractors, utility reps, and excavation crews.

71.     Per OTM's policies, Perez could not refuse to answer calls from OTM or its clients, even if he was not "clocked in."

72.     And these calls were necessary for Perez to coordinate and schedule any meetings with OTM's clients, contractors, utility reps, and excavation crews needed to complete his assigned tickets for that day.

73.     In other words, Perez could not provide utility locating services to OTM's clients *unless* he performed this pre-ticket "off the clock" work.

74.     Thus, Perez performed this pre-ticket work for OTM's—not his own—predominant benefit.

75.     Similarly, after completing his last assigned ticket (and "clocking out" for his shift), Perez drove his company truck back to his home and unloaded his utility locating equipment.

76.     Once again, during his commute, Perez constantly made and fielded calls from OTM's clients, contractors, utility reps, and excavation crews.

77.     In fact, OTM required and expected its utility locators (like Perez) to constantly be "on-call" and respond to after-hours excavation notices and other client calls, even if they were "clocked out."

78.     And much like his pre-ticket "off the clock" work, Perez's post-ticket "off the clock" work was integral and indispensable to the utility locating services OTM employed him to perform.

79.     Indeed, Perez could not provide utility locating services to OTM's clients *unless* he performed this post-ticket "off the clock" work.

80.     Thus, Perez performed this post-ticket work for OTM's—not his own—predominant benefit.

81.     Perez spent approximately 1 to 2 hours a day (or 5 to 12 hours a week) performing this pre- and post-ticket work "off the clock."

82.     And OTM knew Perez performed this pre- and post-ticket work "off the clock" because OTM closely monitored his work time and locations via its company-wide ticketing system, GPS trackers, and/or dash cameras to ensure he meet OTM's strict productivity requirements.

83.     Specifically, using timecard details and GPS data tracked by OTM's uniform ticketing system, Perez's company truck, Perez's company laptop, and/or Perez's company cellphone OTM could easily determine whether Perez was working "off the clock" before and after his shifts.

84.     Thus, OTM management level employees could easily determine if Perez was "clocked out" while his company truck was moving, he was taking/making calls on his company cellphone, and/or if he was logged into his company laptop (and, therefore, he was working).

85.     Perez also complained to his supervisor (Alex) about being forced to work "off the clock" to complete his heavy workload.

86.     Despite accepting the benefits, OTM did not pay Perez for the work he performed "off the clock" before his first ticket and after his last ticket.

87.     Similarly, throughout his employment, OTM subjected Perez to its illegal meal break policy.

88.     Specifically, OTM required Perez to "clock out" for an hour a day for so-called "meal breaks."

89.     OTM required Perez to "clock out" for this time regardless of whether he actually received a *bona fide* meal break.

90.     If Perez did not "clock out" and record he took a "meal break" each shift, OTM would discipline him and not approve his timesheets.

91.     But Perez did not actually receive *bona fide* meal breaks.

92.    Instead, to complete his heavy workload in accordance with OTM's strict productivity requirements, Perez was forced to perform his regular utility locating duties "off the clock" during his unpaid "meal breaks."

93.    So, rather than receiving overtime pay for all his hours worked over 40 in a week, under its illegal "ticket to ticket" and meal break policies, OTM only paid Perez for the time he worked between his arrival at his first assigned ticket and his departure from his last assigned ticket, less his hour-long on-duty "meal break," in willful violation of the FLSA and NYLL.

94.    OTM subjects its other Hourly Utility Locators to the same policies it imposed on Perez.

95.    Like Perez, OTM pays its other Hourly Utility Locators on an hourly basis.

96.    Like Perez, OTM requires its other Hourly Utility Locators to report their hours worked to OTM for approval via OTM's uniform timekeeping and ticketing system.

97.    OTM's records show that, like Perez, the other Hourly Utility Locators regularly work more than 40 hours a week "on the clock."

98.    Indeed, like Perez, the other Hourly Utility Locators typically work 10 to 12 hours a day for 5 to 6 days a week (or 50 to 72 hours a week) "on the clock."

99.    OTM also subjects its other Hourly Utility Locators to the same policies, procedures, and strict operational and productivity requirements that it imposed on Perez.

100.    OTM requires its Hourly Utility Locators (like Perez) to complete their tickets in a timely manner.

101.    OTM uniformly pressures and expects its Hourly Utility Locators (like Perez) to complete as many tickets as possible.

102.    And OTM closely supervises and tracks its Hourly Utility Locators' productivity through its ticketing system to ensure they comply with OTM's uniform expectations and complete their heavy workloads.

103.    In fact, OTM installs GPS trackers on Perez's and the other Hourly Utility Locators' company trucks to monitor all their activities, movements, and locations to ensure they complete their heavy workloads in accordance with OTM's strict productivity and operational requirements.

104.    But just as with Perez, OTM does not pay its other Hourly Utility Locators for all their hours worked.

105.    Instead, like Perez, the other Hourly Utility Locators are forced to perform compensable work "off the clock" during their "meal breaks" and before and after their shifts to complete their heavy workloads in satisfaction of OTM's strict productivity requirements.

106.    Indeed, OTM subjects its other Hourly Utility Locators to its same illegal "ticket to ticket" policy it imposed on Perez.

107.    Specifically, OTM prohibits its Hourly Utility Locators (like Perez) from "clocking in" for their shifts until they arrive at their first assigned ticket and requires them to "clock out" for their shifts when they leave their last assigned ticket.

108.    But like Perez, OTM also requires its other Hourly Utility Locators to perform compensable work "off the clock" before they arrive at their first assigned ticket and after they leave their last assigned ticket.

109.    The "off the clock" work Perez and the other Hourly Utility Locators perform before they arrive at their first assigned ticket and after they leave their last assigned ticket is similar if not the same.

110.    Specifically, before clocking in for their shifts, the other Hourly Utility Locators (like Perez) are forced to review tickets, route plan, make/take constant calls from OTM's clients, load their

utility locating equipment into their company trucks, attend crew meetings, and/or drive to their first assigned ticket "off the clock" and without pay.

111.    Likewise, after clocking out for their shifts at their last assigned ticket, the other Hourly Utility Locators (like Perez) are forced to drive home, unload their utility locating equipment from their company trucks, make/take calls from OTM's clients, and/or respond to any emergencies "off the clock" and without pay.

112.    And like Perez, the other Hourly Utility Locators spend approximately 1 to 2 hours a day (or 5 to 12 hours a week) performing this compensable pre- and post-ticket work "off the clock" without pay.

113.    OTM controls Perez's and the other Hourly Utility Locators' pre- and post-ticket "off the clock" work, and this "off the clock" work is undertaken primarily for the benefit of OTM's business of providing utility locating services to its clients.

114.    Further, this mandatory pre- and post-ticket "off the clock" work is necessary to the principal work Perez and the other Hourly Utility Locators perform as OTM utility locators.

115.    Indeed, Perez and the other Hourly Utility Locators cannot provide utility locating services to OTM's clients in accordance with OTM's strict productivity and operational requirements *unless* they perform this pre- and post-ticket "off the clock" work.

116.    In other words, Perez's and the other Hourly Utility Locators' mandatory pre- and post-ticket "off the clock" work is a fundamental requirement of their jobs as OTM utility locators.

117.    Indeed, OTM could not eliminate this pre- and post-ticket "off the clock" work altogether without impairing Perez's and the other Hourly Utility Locators' ability to perform their utility locating work.

118.    Rather, this mandatory pre- and post-ticket "off the clock" work is integral and indispensable to Perez's and the other Hourly Utility Locators' work as OTM utility locators.

119.    Thus, Perez and the other Hourly Utility Locators routinely perform this mandatory pre- and post-ticket "off the clock" work for OTM's—not their own—predominant benefit.

120.    And OTM knows Perez and its other Hourly Utility Locators perform this compensable pre- and post-ticket work "off the clock" because OTM requires them to do so.

121.    Again, OTM closely monitors and tracks Perez's and the other Hourly Utility Locators' work time and locations via its company-wide ticketing system, GPS trackers, and/or dash cameras to ensure they meet OTM's strict productivity requirements.

122.    Specifically, using timecard details and GPS data tracked by OTM's uniform ticketing system, their company trucks, their company laptops, and/or their company cellphones OTM can easily determine whether Perez and the other Hourly Utility Locators are working "off the clock" before and after their shifts.

123.    And like Perez, other Hourly Utility Locators complained to OTM about being forced to work "off the clock" to complete their heavy workloads in satisfaction of OTM's strict productivity and operational requirements.

124.    But OTM fails to exercise its duty as Perez's and the other Hourly Utility Locators' employer to ensure they are not performing work that OTM does not want performed "off the clock" before their first ticket and after their last ticket.

125.    Thus, OTM requested, suffered, permitted, or allowed Perez and its other Hourly Utility Locators to work "off the clock" before their first ticket and after their last ticket.

126.    Despite accepting the benefits, OTM does not pay Perez and its other Hourly Utility Locators for the time they spend performing this compensable work "off the clock."

127.    Thus, under its illegal "ticket to ticket" policy, OTM fails to pay Perez and its other Hourly Utility Locators overtime pay for the time they spend performing compensable work "off the

clock" before their first ticket and after their last ticket during workweeks in which they work over 40 hours in willful violation of the FLSA and NYLL.

128.    Similarly, OTM also subjects its other Hourly Utility Locators to the same illegal meal break policy it imposed on Perez.

129.    Specifically, just as with Perez, OTM requires its other Hourly Utility Locators to "clock out" for an hour a day for so-called "meal breaks."

130.    OTM requires its Hourly Utility Locators to "clock out" for this time regardless of whether they actually receive a full, uninterrupted meal break.

131.    If Perez and the other Hourly Utility Locators do not "clock out" and record they took a "meal break," OTM will discipline them and refuse to approve their timesheets.

132.    OTM simply assumes Perez and its other Hourly Utility Locators receive *bona fide* meal breaks.

133.    But Perez and the other Hourly Utility Locators do not actually receive *bona fide* meal breaks.

134.    Instead, to complete their assigned heavy workloads in accordance with OTM's uniform, strict operational and productivity requirements (and OTM's close monitoring of the same), Perez and the other Hourly Utility Locators are forced to perform their regular utility locating duties and responsibilities "off the clock" during their unpaid "meal breaks."

135.    Specifically, during their unpaid "meal breaks," Perez and other Hourly Utility Locators regularly perform work-related tasks, such as completing tickets, driving from one ticket to another, taking/making calls to OTM's clients, and/or route planning.

136.    The "off the clock" work Perez and the other Hourly Utility Locators perform during their "meal breaks" is similar if not the same.

137.    Because of these constant work-related tasks, Perez and the other Hourly Utility Locators are not free to engage in personal activities during their unpaid "meal breaks."

138.    Thus, Perez and the other Hourly Utility Locators routinely spend their unpaid "meal breaks" performing work "off the clock" for OTM's—not their own—predominant benefit.

139.    This unpaid "off the clock" work is compensable under the FLSA and NYLL because OTM knew, or should have known, that: (1) Perez and the other Hourly Utility Locators were performing unpaid work during their "off the clock" meal breaks; (2) they were interrupted or subject to interruptions with work duties during any attempted meal break; (3) they were not completely relieved of all duties during their meal breaks; (4) they entirely skipped their meal breaks due to work demands; (5) their meal breaks were less than 20 consecutive minutes; (6) they were not free to engage in personal activities during their meal break because of constant interruptions; and/or (7) they spent their unpaid meal breaks performing their regular utility locating duties for OTM's predominant benefit.

140.    OTM fails to exercise its duty as Perez's and the other Hourly Utility Locators' employer to ensure they are not performing work that OTM does not want performed "off the clock" during their unpaid "meal breaks."

141.    And OTM knows Perez and the other Hourly Utility Locators regularly work "off the clock" during their unpaid "meal breaks."

142.    Again, using timecard details and GPS data tracked by OTM's uniform ticketing system, their company trucks, their company laptops, and their company cellphones OTM can easily determine whether Perez and the other Hourly Utility Locators are working "off the clock" during their unpaid "meal breaks."

143.    Despite accepting the benefits, OTM does not pay Perez and its other Hourly Utility Locators for the compensable work they perform "off the clock" during their unpaid "meal breaks."

144.    Thus, under its illegal meal break policy, OTM fails to pay Perez and the other Hourly Utility Locators overtime for their on-duty "meal breaks" during workweeks in which they work over 40 hours in willful violation of the FLSA and NYLL.

### OTM'S VIOLATIONS WERE WILLFUL AND/OR DONE IN RECKLESS DISREGARD OF THE FLSA AND NEW YORK LAW

145.    Perez incorporates all other paragraphs by reference.

146.    OTM knew it was subject to the FLSA's and NYLL's respective overtime provisions.

147.    OTM knew the FLSA and NYLL required it to pay non-exempt employees, including its Hourly Utility Locators, overtime wages at rates not less than 1.5 times their regular rates of pay for all hours worked after 40 in a workweek.

148.    OTM knew the Hourly Utility Locators were its non-exempt employees entitled to overtime pay.

149.    OTM knew it paid its Hourly Utility Locators on an hourly basis.

150.    OTM knew each Hourly Utility Locators worked over 40 hours in at least one workweek during relevant period(s).

151.    OTM knew the FLSA and NYLL required it to pay employees, including its Hourly Utility Locators, for all hours they performed compensable work.

152.    OTM knew that, as the Hourly Utility Locators' employer, it had a duty to ensure they were not performing work "off the clock" (without pay) that OTM did not want performed.

153.    OTM knew it prohibited its Hourly Utility Locators from "clocking in" for their shifts until they arrived at their first assigned ticket.

154.    Nonetheless, OTM knew its Hourly Utility Locators performed compensable work "off the clock" before they arrived at their first assigned ticket.

155.    Likewise, OTM knew it required its Hourly Utility Locators to "clock out" for their shifts when they left their last assigned ticket.

156.    Nonetheless, OTM knew its Hourly Utility Locators performed compensable work "off the clock" after they left their last assigned ticket.

157.    Thus, OTM knew it requested, suffered, permitted, or allowed its Hourly Utility Locators to work "off the clock" before they arrived at their first assigned ticket and after they left their last assigned ticket.

158.    OTM knew it controlled the Hourly Utility Locators' pre- and post-ticket "off the clock" work.

159.    OTM knew the Hourly Utility Locators' pre- and post-ticket "off the clock" work was undertaken for OTM's predominant benefit.

160.    OTM knew the Hourly Utility Locators' pre- and post-ticket "off the clock" work was necessary to the principal work they performed as OTM utility locators.

161.    OTM knew the Hourly Utility Locators' pre- and post-ticket "off the clock" work was integral and indispensable to their work as OTM utility locators.

162.    Thus, OTM knew, should have known, or recklessly disregarded whether its Hourly Utility Locators performed compensable work "off the clock" before they arrived at their first assigned ticket and after they left their last assigned ticket.

163.    Nonetheless, OTM did not pay its Hourly Utility Locators for the compensable work they performed "off the clock" before they arrived at their first assigned ticket and after they left their last assigned ticket.

164.    OTM also knew it required its Hourly Utility Locators to "clock out" for an hour a day for so-called "meal breaks."

165.    OTM knew its Hourly Utility Locators did not actually receive *bona fide* meal breaks.

166.    OTM knew its Hourly Utility Locators regularly spent their "meal breaks" performing their regular utility locating duties "off the clock" for OTM's predominant benefit.

167.    Thus, OTM knew it requested, suffered, permitted, or allowed its Hourly Utility Locators to work "off the clock" during their "meal breaks."

168.    In other words, OTM knew, should have known, or recklessly disregarded whether its Hourly Utility Locators performed compensable work "off the clock" during their "meal breaks."

169.    Nonetheless, OTM did not pay its Hourly Utility Locators for the work they performed "off the clock" during their "meal breaks."

170.    Thus, OTM knew, should have known, or recklessly disregarded whether it failed to pay its Hourly Utility Locators for all the hours (including overtime) they performed compensable work.

171.    OTM's decision to prohibit its Hourly Utility Locators from "clocking in" for their shifts until they arrived at their first assigned ticket was neither reasonable nor made in good faith.

172.    OTM's decision to require its Hourly Utility Locators to "clock out" for their shifts when they left their last assigned ticket was neither reasonable nor made in good faith.

173.    OTM's decision to require its Hourly Utility Locators to "clock out" for an hour a day for so-called "meal breaks" regardless of whether they actually received *bona fide* meal breaks was neither reasonable nor made in good faith.

174.    OTM's decision not to pay its Hourly Utility Locators overtime wages for all overtime hours worked, including those worked "off the clock," was neither reasonable nor made in good faith.

175.    OTM knew, should have known, or recklessly disregarded whether its conduct described in this Complaint violated the FLSA and NYLL.

176.    OTM knowingly, willfully, and/or in recklessly disregard carried out its illegal policies that systematically deprived Perez and the other Hourly Utility Locators of overtime wages in violation of the FLSA and NYLL.

177.    In sum, OTM's FLSA and NYLL violations were willful, carried out in bad faith, and caused significant damage to Perez and the other Hourly Utility Locators.

CLASS & COLLECTIVE ACTION ALLEGATIONS

178.    Perez incorporates all other paragraphs by reference.

179.    Like Perez, the other Hourly Utility Locators are uniformly victimized by OTM's illegal "ticket to ticket" and meal break policies.

180.    Other Hourly Utility Locators worked with Perez and indicated they were paid in the same manner, performed similar physical work, and were subject to OTM's same illegal "ticket to ticket" and meal break policies.

181.    Based on his experience with OTM, Perez is aware OTM's illegal "ticket to ticket" and meal break policies were imposed on the other Hourly Utility Locators.

182.    The putative class of Hourly Utility Locators includes more than 100 members.

183.    Thus, the putative class of Hourly Utility Locators is so numerous that the joining of all class members in one lawsuit is impractical.

184.    The Hourly Utility Locators are similarly situated in the most relevant respects.

185.    Even if their precise job titles, exact duties, and locations might vary somewhat, these differences do not matter for the purposes of determining their entitlement to their overtime pay for all hours worked over 40 in a week.

186.    Rather, the Putative Class is held together by OTM's illegal "ticket to ticket" and meal break policies, which systematically deprived Perez and the Hourly Utility Locators of overtime wages.

187.    OTM's records reflect the number of hours the Hourly Utility Locators recorded they worked each week.

188.    OTM's records also show the number of hours the Hourly Utility Locators *actually* worked each week.

189.     The back wages owed to Perez and the other Hourly Utility Locators can therefore be calculated using the same formula applied to the same records.

190.     Even if the issue of damages were somewhat individual in character, the damages can be calculated by reference to OTM's records, and there is no detraction from the common nucleus of liability facts.

191.     Therefore, the issue of damages does not preclude class or collective treatment.

192.     And Perez's experiences are therefore typical of the experiences of the other Hourly Utility Locators.

193.     Perez has no interest contrary to, or in conflict with, the interests of other Hourly Utility Locators that would prevent class or collective treatment.

194.     Like each Hourly Utility Locator, Perez has an interest in obtaining the untimely wages and overtime wages owed to them under federal and New York law.

195.     Perez and his counsel will fairly and adequately represent the Hourly Utility Locators and their interests.

196.     Indeed, Perez retained counsel with significant experience in handling complex class and collective action litigation.

197.     A class and collective action is superior to other available means for fair and efficient adjudication of this lawsuit.

198.     Absent this class and collective action, many Hourly Utility Locators will not obtain redress for their injuries, and OTM will reap the unjust benefits of violating the FLSA and NYLL.

199.     Further, even if some of the Hourly Utility Locators could afford individual litigation against OTM, it would be unduly burdensome to the judicial system.

200.     Indeed, the multiplicity of actions would create a hardship for the Hourly Utility Locators, the Court, and OTM.

201.    Conversely, concentrating the litigation in one forum will promote judicial economy and consistency, as well as parity among the Hourly Utility Locators' claims.

202.    The questions of law and fact that are common to each Hourly Utility Locator predominate over any questions affecting solely the individual members.

203.    The common questions of law and fact include:

a.    Whether OTM engaged in a policy and practice of prohibiting its Hourly Utility Locators from "clocking in" for their shifts until they arrived at their first assigned ticket;

b.    Whether OTM engaged in a policy and practice of requiring its Hourly Utility Locators to "clock out" for their shifts once they left their last assigned ticket;

c.    Whether OTM engaged in a policy and practice of requiring its Hourly Utility Locators to "clock out" for an hour a day for "meal breaks," regardless of whether they actually received a *bona fide*, uninterrupted meal break;

d.    Whether OTM knew, or had reason to know, it requested, suffered, permitted, or allowed its Hourly Utility Locators to work "off the clock" during their unpaid "meal breaks," before their first ticket, and/or after their last ticket;

e.    Whether OTM failed to pay its Hourly Utility Locators overtime wages for all overtime hours worked, including those worked "off the clock," in violation of the FLSA and NYLL;

f.      Whether OTM's decision not to pay the Hourly Utility Locators overtime wages for all overtime hours worked, including those worked "off the clock," was made in good faith; and

g.      Whether OTM's violations were willful.

204.    Perez knows of no difficulty that will be encountered in the management of this litigation that would preclude its ability to go forward as a class or collective action.

205.    OTM's illegal "ticket to ticket" and meal break policies uniformly deprived Perez and the other Hourly Utility Locators of the overtime wages they are owed under the FLSA and New York law.

206.    There are many similarly situated Hourly Utility Locators who have been denied overtime pay in violation of the FLSA who would benefit from the issuance of a court-supervised notice of this lawsuit and the opportunity to join it.

207.    The Hourly Utility Locators are known to OTM and can be readily identified through OTM's business and personnel records.

### COUNT I
#### FAILURE TO PAY OVERTIME WAGES UNDER THE FLSA
#### (FLSA COLLECTIVE)

208.    Perez incorporates all other paragraphs by reference.

209.    Perez brings his FLSA claims on behalf of himself and the other FLSA Collective Members pursuant to 29 U.S.C. § 216(b).

210.    OTM violated, and is violating, the FLSA by employing non-exempt employees (Perez and the other FLSA Collective Members) in a covered enterprise for workweeks longer than 40 hours without paying such employees overtime wages at rates not less than 1.5 times their regular rates of pay for all hours worked after 40 in a workweek, including those worked "off the clock."

211.    OTM's unlawful conduct harmed Perez and the other FLSA Collective Members by depriving them of the overtime wages they are owed.

212.    Accordingly, OTM owes Perez and the other FLSA Collective Members the difference between the overtime wages actually paid and the proper overtime wages actually earned.

213.    Because OTM knew, or showed reckless disregard for whether, its policies violated the FLSA, OTM owes these wages for at least the past 3 years.

214.    OTM is also liable to Perez and the other FLSA Collective Members for an additional amount equal to all unpaid wages as liquidated damages.

215.    Finally, Perez and the other FLSA Collective Members are entitled to recover all reasonable attorneys' fees and costs incurred in this action.

**COUNT II**

**FAILURE TO PAY OVERTIME WAGES UNDER THE NYLL
(NEW YORK CLASS)**

216.    Perez incorporates all other paragraphs by reference.

217.    Perez brings his NYLL overtime claims as a class action on behalf of himself and the other New York Class Members pursuant to FED. R. CIV. P. 23.

218.    OTM's conduct violates the NYLL (NYLL §§ 190, *et seq.* and 650, *et seq.*) and its implementing regulations (12 NYCRR §§ 142, *et seq.*).

219.    At all relevant times, OTM was subject to the NYLL because OTM was (and is) a covered "employer" within the meaning of the NYLL. *See* NYLL §§ 190(3) and 651(6).

220.    At all relevant times, OTM employed Perez and each New York Class Member as its covered "employees" within the meaning of the NYLL. *See* NYLL §§ 190(2) and 651(5).

221.    The NYLL and its implementing regulations requires employers, like OTM, to pay non-exempt employees, including Perez and the other New York Class Members, overtime wages at

24

rates not less than 1.5 times their regular rates of pay for all hours worked over 40 in a workweek. *See* 12 NYCRR Part 142-3.2; *see also* NYLL §§ 190, *et seq.* and 650, *et seq.*

222.    Perez and the other New York Class Members are entitled to overtime pay under the NYLL and its implementing regulations.

223.    Perez's and the other New York Class Members' unpaid overtime wages are recoverable "wages" within the meaning of the NYLL. *See* NYLL § 190(1).

224.    OTM violated, and is violating, the NYLL and its implementing regulations by employing non-exempt employees (Perez and the other New York Class Members) for workweeks longer than 40 hours without paying such employees overtime wages at rates not less than 1.5 times their regular rates of pay for all hours worked over 40 in a workweek, including those hours worked "off the clock." *See* 12 NYCRR Part 142-3.2; *see also* NYLL §§ 190, *et seq.* and 650, *et seq.*

225.    OTM's unlawful conduct harmed Perez and the other New York Class Members by depriving them of the overtime wages they are owed.

226.    Accordingly, OTM owes Perez and the other New York Class Members the difference between the overtime wages actually paid and the proper overtime wages actually earned, plus liquidated damages in an amount equal to their unpaid wages, as well as interest on those amounts. *See* NYLL §§ 198(1-a) and 663(1).

227.    Finally, Perez and the other New York Class Members are also entitled to record their reasonable attorneys' fees and costs incurred in this action. *See* NYLL §§ 198(4) and 663(1).

### JURY DEMAND

228.    Perez demands a trial by jury on all Counts.

### RELIEF SOUGHT

WHEREFORE, Perez, individually and on behalf of the other Hourly Utility Locators, seeks the following relief:

a.     An Order designating this lawsuit as a collective action and authorizing notice to the FLSA Collective Members allowing them to join this action by filing a written notice of consent;

b.     An Order certifying a class action pursuant to FED. R. CIV. P. 23;

c.     An Order appointing Perez as his counsel to represent the interests of the Hourly Utility Locators;

d.     An Order finding OTM liable to Perez and the other FLSA Collective Members for all unpaid overtime wages owed under the FLSA plus liquidated damages in an amount equal to their unpaid wages;

e.     An Order finding OTM liable to Perez and the other New York Class Members their unpaid overtime wages owed under the NYLL plus liquidated damages in an amount equal to their unpaid wages;

f.     Judgement awarding Perez and the other Hourly Utility Locators all unpaid wages, liquidated damages, statutory damages, and any other penalties available under the FLSA and NYLL;

g.     An Order awarding attorneys' fees, costs, and expenses incurred in this action;

h.     Pre- and post-judgment interest at the highest applicable rates; and

i.     Such other and further relief as may be necessary and appropriate.

Dated:  April 17, 2024.

Respectfully submitted,

**PELTON GRAHAM LLC**

By: _____
     Brent E. Pelton
111 Broadway, Suite 1503
New York, New York 10006
Phone: (212) 385-9700

Michael A. Josephson*
Andrew W. Dunlap*
**JOSEPHSON DUNLAP LLP**
11 Greenway Plaza, Suite 3050
Houston, Texas 77046
Phone: (713) 352-1100
Fax:      (713) 352-3300
mjosephson@mybackwages.com
adunlap@mybackwages.com

Richard J. (Rex) Burch*
**BRUCKNER BURCH PLLC**
11 Greenway Plaza, Suite 3025
Houston, Texas 77046
Phone: (713) 877-8788
Fax:      (713) 877-8065
rburch@brucknerburch.com

*Pro hac vice applications forthcoming*

**ATTORNEYS FOR PEREZ AND
THE HOURLY UTILITY LOCATORS**

# EXHIBIT 1

<u>CONFIDENTIAL FAIR LABOR STANDARDS ACT EMPLOYMENT SERVICES CONSENT</u>

Print Name: <u>Harold Perez</u>

1.  I hereby consent to make a claim against <u>On The Mark</u> to pursue my claims of unpaid overtime during the time that I worked with the company.

2.  I designate the law firm and attorneys at JOSEPHSON DUNLAP, LLP and BRUCKNER BURCH PLLC as my attorneys to prosecute and make decisions concerning my wage claims, the manner and method of conducting this litigation, the entering of an agreement with Plaintiffs' counsel concerning attorneys' fees and costs, and all other matters pertaining to this lawsuit.

3.  I authorize the law firm and attorneys at JOSEPHSON DUNLAP, LLP and BRUCKNER BURCH PLLC to use this consent to file my claim in a separate lawsuit, class/collective action, or arbitration against <u>On The Mark</u>.

4.  I understand that, by filing this Consent Form, I will be bound by the Judgment of the Court or arbitrator on all issues in this case.

Signature: <u>Harold Perez (Mar 8, 2024 19:44 EST)</u>    Date Signed: <u>Mar 8, 2024</u>